```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
AMBAC ASSURANCE CORPORATION,             :
                                         :
                    Plaintiff,           :
                                         :           Opinion and Order
        -against-                        :           09 Civ. 5087 (JFK)
                                         :
ADELANTO PUBLIC UTILITY AUTHORITY,       :
                                         :
                    Defendant.           :
-----------------------------------------X
```

APPEARANCES:

FOR PLAINTIFF AMBAC ASSURANCE CORPORATION:

    David W. Dykhouse, Esq.
    Robert P. LoBue, Esq.
    PATTERSON BELKNAP WEBB & TYLER LLP

FOR DEFENDANT ADELANTO PUBLIC UTILITY AUTHORITY:

    William M. Marticorena, Esq.
    A. Patrick Munoz, Esq.
    Todd O. Litfin, Esq.
    RUTAN & TUCKER, LLP

    Michael S. O'Reilly, Esq.
    E. Evans Wohlforth, Jr., Esq.
    GIBBONS P.C.

**JOHN F. KEENAN, United States District Judge:**

    This action arises from the early termination of an interest rate swap agreement between Piper Jaffray & Company ("Piper Jaffray") and defendant Adelanto Public Utility Authority (the "Authority" or "Defendant"). Plaintiff Ambac Assurance Corporation ("Ambac" or "Plaintiff"), a surety to the agreement, brings claims for reimbursement, breach of contract, and specific performance as a result of an early termination

payment it made to Piper Jaffray that has not been reimbursed by the Authority. Before the Court is the Authority's motion to dismiss for lack of subject matter jurisdiction and lack of venue. For the reasons that follow, the motion is denied.

## I.  BACKGROUND

The following facts are derived from Ambac's Amended Complaint ("Am. Compl.").

Ambac, a Wisconsin corporation with its principal place of business in New York City, is in the business of surety and financial guaranty insurance. The Authority is a public utility authority existing under the laws of California, with its principal place of business in Adelanto, California.

In or about September 2005, the Authority issued $70,635,000 face amount of Variable Rate Revenue Bonds, 2005 Series A and B (Utility System Project) (the "Bonds"). The Bonds were underwritten by Piper Jaffray. Ambac issued a policy of bond insurance with respect to the Bonds, insuring payment of the principal and interest thereon.

Contemporaneously with its issuance of the Bonds, the Authority entered into an interest rate swap agreement (the "Swap Agreement") with Piper Jaffray in order to hedge its risk as the issuer of the Bonds. The Swap Agreement stays in effect for the life of the Bonds, but it may be terminated upon the occurrence of certain events, such as a party's default or

bankruptcy.  In the event of an early termination, the Swap Agreement provides for certain payments to compensate for the termination.

On September 7, 2005, Ambac issued a surety bond for the Swap Agreement (the "Surety Bond").  The Surety Bond provides that if the Authority were to fail to make certain payments required by the Swap Agreement, including certain termination payments, Ambac would make those payments.

Ambac was not a party to the Swap Agreement, but it is specifically identified in it as the issuer of the Surety Bond and is given the title "Swap Insurer."  The Swap Agreement further provides that the Authority shall unconditionally reimburse Ambac, as the Swap Insurer, for any incurred fees, costs, or other expenses resulting from a breach of the Authority's obligations under the Swap Agreement.  The Authority is also obligated under the Swap Agreement to reimburse Ambac for any amounts paid under the Surety Bond and any costs of collection and enforcement thereof, with interest at a specified rate.

The Swap Agreement is governed by New York law.[1]  Regarding venue, the parties agreed as follows:

---

[1] The Swap Agreement specifically provides that it "will be governed by and construed in accordance with the laws of the State of New York, without reference to its choice of law doctrine; provided, however, that the power and authority of the

>   With respect to any suit, action, or proceeding relating to this Agreement ("Proceedings"), each party irrevocably –
>
>   (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the exclusive jurisdiction of the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
>   (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party;
>
>   provided that Party A [Piper Jaffray] will consent to the transfer of any such Proceedings initiated by Party B [the Authority] to the United States District Court with jurisdiction of the Government Entity [the Authority] if prior to seeking such transfer Party B has taken all steps as may be required by the laws that would be applicable in such transferee court to effect the valid waiver of jury trial by Party B in such court.

(Def. Ex. A § 11(b)(1), Schedule Part 3(f).) (the "forum-selection provision").

On November 5, 2008 Moody's Investors Service downgraded Ambac's credit rating. Pursuant to the Swap Agreement, the downgrade of Ambac's credit rating required the Authority either to replace Ambac as the Swap Insurer or to obtain or maintain an unenhanced rating on the Bonds at or above a certain minimum

---

Government Entity [the Authority] to enter into this Agreement . . . will be governed by the laws of the State of California." (Def. Ex. A., at Schedule Part 3(f).)

within 30 days.  The Authority's failure to satisfy either of those tasks within that time period would allow Piper to terminate the Swap Agreement.  According to Ambac, the Authority did not make a good-faith effort to satisfy the terms of the Swap Agreement in either manner.  Piper Jaffray chose not to immediately terminate the Swap Agreement; instead, in a letter dated February 5, 2009, Piper Jaffray stated that it "would like to resolve this matter without terminating," but it would do so if the Authority did not make "substantial and prompt progress" in resolving its financial difficulties. (Am. Compl. ¶ 16.)

   The Authority failed to resolve its financial difficulties to the satisfaction of Piper Jaffray, and as a result, Piper Jaffray terminated the Swap Agreement and demanded a termination payment of $4,524,000 by notice to the Authority dated June 1, 2009.  That same day, June 1, 2009, Ambac filed the instant action against the Authority, seeking the equitable remedies of <u>quia timet</u> and exoneration to compel the Authority to make the termination payment.  Ambac made that $4,524,000 payment to Piper Jaffray on June 3, 2009, two days after the notice of termination because, according to Ambac, the Authority "failed to pay the termination payment in a timely manner," rendering Ambac liable for that amount pursuant to its obligations under the Surety Bond. (Am. Compl. ¶ 26.)  After making the termination payment to Piper Jaffray, on June 24, 2009, Ambac

- 5 -

amended the Complaint to assert claims for breach of contract, reimbursement, and specific performance.

The Authority moves to dismiss the Amended Complaint for lack of subject matter jurisdiction and lack of venue. It claims that although the requirements of diversity jurisdiction are present, the Court is stripped of jurisdiction under the Johnson Act. It further argues that the case does not belong in this district in light of the forum-selection provision of the Swap Agreement.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss for lack of subject matter jurisdiction, plaintiff "has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). The Court accepts as true all material factual allegations in the Complaint, but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

"[T]he burden of showing that venue in the forum district is proper falls on the plaintiff." U.S.E.P.A. ex rel. McKeown v. Port Auth. of N.Y. & N.J., 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001). All facts must be construed in a light most favorable to

the plaintiff, and the Court may consider documents outside of the complaint. See Cartier v. Micha, Inc., No. 06 Civ. 4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007).

### B.   The Johnson Act

Defendant concedes that this case fulfills the requirements of federal diversity jurisdiction under 28 U.S.C. 1332(a); the parties are diverse and the amount in controversy is well over $75,000.  It contends, however, that the Court is stripped of jurisdiction to preside over this case by the Johnson Act, 28 U.S.C. § 1342, which provides:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

Id.

The Johnson Act was enacted in 1934 following "[a] quarter century of agitation to eliminate federal court interference with state control of public utility rates." Note, Limitation of

Lower Federal Court Jurisdiction Over Public Utility Rate Cases, 44 Yale L.J. 119, 119 (1934). Before the passage of the Johnson Act, utilities were able to invoke federal diversity jurisdiction to challenge the orders of state agencies or rate-making authorities, a procedure the states objected to because it involved the "federal court's passing upon the validity of the states' regulatory action to the exclusion of a determination by the states' own courts . . . [and also] the expense and delay frequently incident to this type of federal judicial review." Id. As observed by the United States Supreme Court, the Act's legislative history "makes clear that its purpose was to prevent public utilities from going to federal district court to challenge state administrative orders or avoid state administrative and judicial proceedings." California v. Grace Brethren Church, 457 U.S. 393, 410 n.22 (1982).

Courts have made clear that the Johnson Act is to be construed broadly. See, e.g., Miller v. N.Y. Pub. Serv. Comm'n, 807 F.2d 28, 31 (2d Cir. 1986); see also Tennyson v. Gas Serv. Co., 506 F.2d 1135, 1138 (10th Cir. 1974) ("[The Johnson Act's] broad wording [makes clear] that it was intended to keep constitutional challenges to orders affecting rates out of federal courts "lock, stock and barrel . . . ."). As the party attempting to invoke the Johnson Act, the Authority bears the burden of establishing that its requirements are present. Hill

- 8 -

v. Kansas Gas Serv. Co., 323 F.3d 858, 863 (10th Cir. 2003); Williams v. Prof'l Transp., Inc., 294 F.3d 607, 612 (4th Cir. 2002).

The threshold question in determining whether a case falls within the purview of the Johnson Act is whether there is a challenge to an "order affecting rates." Hill, 323 F.3d at 863; Williams, 294 F.3d at 612. The Authority provides little information regarding the procedures under which it operates and has not directed the Court to any administrative order that would be restrained by the relief requested by Ambac. The only information in the present record regarding how the rates to be charged for water and sewer service in Adelanto are determined is the uncontested assertion in Ambac's opposition to this motion that the Authority is a self-regulating, publicly-owned utility that sets its own rates under its own procedures.

Rather than identifying a present rate order that would be restrained if this contract dispute was resolved in Plaintiff's favor, the Authority claims that it would be restrained from setting rates as it so chooses in the future, thus affecting "future rate orders." Some courts have held that "future rate orders are a subset of the larger set comprising 'any order affecting rates.'" US West, Inc. v. Tristani, 182 F.3d 1202, 1210 (10th Cir. 1999) (quoting US West, Inc. v. Nelson, 146 F.3d 718, 723 (9th Cir. 1998)). However, if indeed the Authority has

the ability to set its own rates, the Authority fails to explain how such a future rate order could exist, and to whom and under what circumstances it would be issued. To the extent the Authority operates under a self-regulating scheme under which no orders are issued, it does not follow that future rate orders would be restrained.

The Authority also cites several cases in support of its argument that courts have interpreted the Johnson Act as covering utilities, like the Authority, that have the ability to set their own rates. The cases cited by the Authority do not go so far as to bar federal jurisdiction over disputes, like the present matter, in which there is no identified rate order issued by a separate government entity. These courts only held that although the Johnson Act specifically refers to state agencies or political subdivisions, it also strips the federal court of jurisdiction over challenges to orders affecting rates made by local political entities. See, e.g., Gen. Inv. & Serv. Corp. v. Wichita Water Co., 236 F.2d 464, 467 (10th Cir. 1956) ("While the Act strikes at a rate order made by a State administrative agency or a rate-making body, it applies with equal force to rates fixed by city ordinances."); Trading Co. of N. Am., Inc. v. Bristol Twp. Auth., 47 F. Supp. 2d 563, 573 (E.D. Pa. 1999) ("The Township of Bristol qualifies as a state rate-making body because it is responsible for drafting the

ordinances pertaining to the sewers, including the rates that will be charged."). Each of these cases cited by the Authority shares the common presence of a rate order issued by a local government entity that would be restrained by a finding of liability. Here, the Authority has made no such showing; it fails to identify any rate order issued by the State of California, the City or Adelanto, or any other entity.

The Authority has not carried its burden of showing that this case fulfills the conditions of the Johnson Act. The Act contemplates not only an "order affecting rates," but also the existence of both a public utility and a separate "State administrative agency or a rate-making body of a State political subdivision" which issues such order. 28 U.S.C. § 1342. For the Court to shoehorn this action into the language of the Johnson Act, it would have to infer that the Authority issues rate orders to itself. The Court will not extend the Act's reach in that manner. Although the Johnson Act is to be construed broadly, the Court will not expand its scope to touch all actions remotely related to utility rates, regardless of whether they involve a rate order of a separate administrative entity.

Even if the Authority directed the Court to a relevant order on rates, the Court still would have jurisdiction over

Ambac's breach of contract and reimbursement claims.[2] To implicate the Johnson Act, not only must there be an identified rate order, the cause of action must also seek to "enjoin, suspend or restrain" it. 28 U.S.C. § 1342; see Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he Act does not apply when the action is not in any manner a challenge to the rates charged by the regulated industry."). The Complaint alleges that the Authority is in breach of the Swap Agreement by failing to make a termination payment or reimburse Ambac for the termination payment as well as the fees, costs, and expenses that it incurred as a result of the Authority's nonpayment. The only manner in which these causes of action possibly bear on rates is if the Authority were inclined to raise them to cover monetary losses in the event of a large damages award. If a claim were barred from federal court under the Johnson Act merely because the financial blow to the public utility from an adverse judgment may cause it to raise rates in the future, then the "order affecting rates"

---

[2] The only claim that arguably could restrain an order affecting rates, assuming that such an order exists, is the claim for specific performance. Ambac requests the Court under this cause of action to "order the Authority to specifically perform" its obligation under the Swap Agreement "to fix, prescribe, revise and collect rates, fees, and charges which are at least sufficient to cover the Termination Payment as well as other financial obligations." (Compl. ¶ 36.) As previously mentioned, however, this cause of action survives Defendant's motion to dismiss because it has not identified an "order affecting rates."

requirement would be a nullity and public utilities essentially would be immune to federal diversity jurisdiction. See Shrader v. Horton, 471 F. Supp. 1236, 1239-40 (W.D. Va. 1979)(collecting cases and observing that "courts have refused to apply the Johnson Act even though the challenged activity . . . would ultimately bear on a rate charged to the public").

The Authority has not carried its burden of showing that the Johnson Act is applicable to the instant matter. Accordingly, the Authority's motion to dismiss for lack of subject matter jurisdiction is denied.

### C. Venue

The Authority contends that this action currently is before the wrong court based on its reading of the forum-selection provision in the Swap Agreement.  It thus requests the Court to dismiss the case, or in the alternative, transfer the proceedings to the Central District of California.  Ambac has refused to consent to the Authority's request for transfer, claiming that it is not bound by the transfer provision within the forum-selection provision of the Swap Agreement.

"It is well-settled that parties may bargain in advance to select the forum in which any future dispute will be litigated." Rogen v. Memry Corp., 886 F. Supp. 393, 395 (S.D.N.Y. 1996). "In determining whether to dismiss a claim based on a forum selection clause, a district court considers whether: (1) the

clause was reasonably communicated to the party resisting enforcement; (2) the clause is mandatory or permissive; and (3) the claims and parties involved are subject to the clause." Salis v. Am. Exp. Lines, 331 F. App'x 811, 813 (2d Cir. 2009).

Here, there is no dispute regarding whether the forum-selection provision was reasonably communicated, and it is also clear that the provision is mandatory. The parties disagree, however, on the extent to which the provisions of the forum-selection provision apply to this action. The Authority argues that (1) the forum-selection provision upon which Ambac bases venue is inapplicable to the instant action; and, in the alternative, that (2) even if the forum-selection provision is applicable, Ambac is contractually bound by its terms to consent to the transfer of this case to another district court with jurisdiction over the Authority, provided that the Authority waives its right to a jury trial.

The provisions of the Swap Agreement which address venue are not particularly concise, most likely because of the manner in which the agreement was drafted. According to Ambac, the parties drafted the Swap Agreement by supplementing a modified form agreement promulgated by the International Swaps and Derivatives Association ("ISDA"). This ISDA Master Agreement, as modified by the parties, provides that with regard to any action arising from the Swap Agreement, if the Swap Agreement is

to be governed by New York law, the parties agree to submit to the exclusive jurisdiction of "the United States District Court located in the Borough of Manhattan in New York City." (Def. Ex. A § 11(b)(1), Schedule Part 3(f).)  The "Schedule," the supplemental portion of the agreement unique to this transaction, specifically provides that the Swap Agreement is to be governed by New York law, with California law governing the issue of whether the Authority had the power and authority to enter into the agreement.  Therefore, under the plain terms of the Swap Agreement, because it is governed by New York law, all parties submitted to the exclusive jurisdiction of this Court — the only federal district court located in Manhattan.  The Authority is incorrect in suggesting that the forum-selection provision somehow is inapplicable because the Swap Agreement references both New York and California law.  The forum-selection provision by its terms is unaffected by collateral agreements to be bound by the laws of a particular state on issues apart from the law which will govern the Swap Agreement.

Thus it is clear that venue is proper in this district under the forum-selection provision of the Swap Agreement.  The relevant inquiry becomes whether Ambac consented to transfer of this action to the Central District of California under the transfer provision.  Ambac contends that this specific portion

of the forum-selection provision is inapplicable to the instant action. The Court agrees.

Ambac is neither "Party A" nor "Party B" to the Swap Agreement and therefore it did not explicitly agree as did "Party A" — that being, Piper Jaffray — to consent to transfer the case to a district court other than the Southern District of New York. The Authority suggests, though, that Ambac, bringing this action as a surety, is bound by the transfer provision because it has no rights superior to Piper Jaffray and "stands in its shoes" in all respects. (Def. Mem. at 14.) The Court need not decide whether Ambac stands in the shoes of Piper Jaffray in this regard because, even if so, the provision is inapplicable to the instant action. Under the plain terms of the Swap Agreement, "Party A" only consented to the transfer of "Proceedings initiated by Party B" — the Authority. The Court is not persuaded by the Authority's suggestion that the phrase "initiated by Party B" modifies the word "transfer" rather than "Proceedings." There is no indication from the otherwise clear contractual language that the limiting phrase was intended to modify anything other than the word it immediately follows. This conclusion is further supported by the drafters' use of the verb "seek" — not "initiate" — later in the Schedule in referring to the type of action the Authority would take with regard to a transfer of venue. The only reasonable

interpretation of the transfer provision is that it is applicable only in instances where the action was originally brought by the Authority.

The Authority contends that this interpretation is illogical as it would mean that the Authority would be the party both initiating the action and seeking a subsequent transfer to its preferred venue. The Authority reasons that if this is the case, then it could bypass the extra step and just file the lawsuit in its desired jurisdiction in the first instance. The Authority ignores, however, that the Master Agreement provides that the parties agree to submit to the exclusive jurisdiction of this district. It is certainly reasonable for Piper Jaffray to agree to modify that provision to allow the Authority to prosecute its claims in the district of its choice, but only to the extent that the Authority first brings the action here and waives its right to a jury trial.

In sum, the forum-selection provision of the Swap Agreement provides that the parties submit to the exclusive jurisdiction of this Court, subject to a transfer provision that allows the Authority to transfer an action brought by it as long as it waives its right to a jury trial. Venue in this district is proper, and, since this case was brought by Ambac, the transfer provision is inapplicable.

- 17 -

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is denied.

SO ORDERED.

Dated:  New York, New York
        March 15, 2010

                                          JOHN F. KEENAN
                                    United States District Judge