**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------X
AMBAC ASSURANCE CORPORATION,       :
                                   :
                    Plaintiff,     :
                                   :
     -against-                     :
                                   :
ADELANTO PUBLIC UTILITY AUTHORITY, :
                                   :
                    Defendant.     :
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 14, 2011
```

09 Civ. 5087 (JFK)

**OPINION & ORDER**

APPEARANCES

     For Plaintiff Ambac Assurance Corporation:

          PATTERSON BELKNAP WEBB & TYLER LLP

          By:  David W. Dykhouse, Esq.
               Brian N. Lasky, Esq.
               Argiroula K. O'Leary, Esq.
               Claire Frost, Esq.

     For Defendant Adelanto Public Utility Authority:

          RUTAN & TUCKER, LLP

          By:  William M. Marticorena, Esq.
               A. Patrick Muñoz, Esq.
               Todd O. Litfin, Esq.

          GIBBONS P.C.

          By:  Michael S. O'Reilly, Esq.
               E. Evans Wohlforth, Jr., Esq.

**John F. Keenan, United States District Judge**

**John F. Keenan, United States District Judge:**

This action arises from the early termination of an interest rate swap agreement between Piper Jaffray & Company ("Piper Jaffray") and defendant Adelanto Public Utility Authority (the "Authority" or "Defendant").  Plaintiff Ambac Assurance Corporation ("Ambac" or "Plaintiff"), a surety to the agreement, brings claims against the Authority for reimbursement, breach of contract, and specific performance as a result of an early termination payment it made to Piper Jaffray that has not been reimbursed by the Authority.  In its Amended Counterclaim, the Authority brings claims against Ambac for breach of contract, breach of an implied covenant of good faith and fair dealing, promissory estoppel, negligence, negligent misrepresentation, fraud, and unjust enrichment.

Before the Court is Ambac's motion to dismiss these counterclaims for failure to state a claim for which relief can be granted.  For the reasons that follow, the motion is granted.

## I.  Background

For purposes of deciding Ambac's motion to dismiss the Authority's Amended Counterclaim, the Court accepts as true all well-pleaded factual allegations therein and makes all reasonable inferences in favor of the Authority. See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 424 (2d Cir. 2008).  The Court also considers the exhibits attached to the

Amended Counterclaim,[1] any documents incorporated by reference in the Amended Counterclaim,[2] and statements made in certain regulatory filings.[3] DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010); Staehr, 547 F.3d at 425.

## A.    The Parties

Ambac, a Wisconsin corporation with its principal place of business in New York, is in the business of surety and financial

---

[1] These exhibits include:  the Indenture of Trust dated September 1, 2005, the First Supplemental Indenture of Trust dated September 1, 2005, the Second Supplemental Indenture of Trust dated September 1, 2005, the Third Supplemental Indenture of Trust dated December 1, 2007, the Commitment for Financial Guaranty Insurance dated July 25, 2005, the Certificate of Bond Insurer concerning the 2005 Series A of the Taxable Variable Rate Refunding Revenue Bonds, the Certificate of Bond Insurer concerning the 2005 Series B of the Taxable Variable Rate Refunding Revenue Bonds, two letters signed by Stephen M Ksenak and dated September 7, 2005, the Ambac Financial Guaranty Insurance Policy with Policy Number 24487BE with attached endorsements, the Ambac Financial Guaranty Insurance Policy with Policy Number 24527BE with attached endorsements, a Consent to Amend Indenture and Convert the Bonds to Auction Rate dated December 1, 2007, and the Certificate of Ambac Assurance Corporation dated December 19, 2007.

[2] These documents include:  the Surety Bond For Swap Agreement dated September 7, 2005 (Decl. of David N. Abramowitz ("Abramowitz Decl.") Ex. 3, ECF No. 35.); the Official Statement for the 2005 Variable Rate Bonds dated September 7, 2005 (Abramowitz Decl. Ex. 10); and the ISDA Master Agreement and Schedule dated September 7, 2005 (Abramowitz Decl. Ex. 11).

[3] These regulatory filings include:  Ambac Financial Group Inc.'s Form 10-K filed March 15, 2004 (Abramowitz Decl. Ex. 4); Ambac Financial Group Inc.'s Form 10-K filed March 15, 2005 (Abramowitz Decl. Ex. 5); Ambac Financial Group Inc.'s Form 10-Q filed May 10, 2005 (Abramowitz Decl. Ex. 6); Ambac Financial Group Inc.'s Form 10-Q filed August 9, 2005 (Abramowitz Decl. Ex. 7); Ambac Financial Group Inc.'s Form 10-K filed March 13, 2006 (Abramowitz Decl. Ex. 8); and Ambac Financial Group Inc.'s Form 10-K filed March 1, 2007 (Abramowitz Decl. Ex. 9).

guaranty insurance.  The Authority is a public utility authority existing under the laws of California, with its principal place of business in Adelanto, California.  The Authority provides water and sewer service within Adelanto, which is located in San Bernadino County.

**B.    September 2005 Bond Offering**

In September 2005, the Authority issued $70,635,000 of two series of variable rate bonds (the "2005 Variable Rate Bonds"). The Authority issued $55,615,000 of 2005 Series A bonds and $15,020,000 of 2005 Series B bonds.  The bonds were underwritten by Piper Jaffray.  Ambac issued two bond insurance policies (the "Bond Insurance Policies") with respect to the 2005 Variable Rate Bonds.  In exchange for insuring the 2005 Series A bonds, Ambac was paid $687,158.46, and in exchange for insuring the 2005 Series B bonds, Ambac was paid $187,347.55.  The parties specifically agreed that the insurance premiums paid by the Authority were "determined in arms-length negotiations in accordance with Ambac's standard procedures and are required to be paid as a condition to the issuance of the [Bond Insurance Policies] and represent reasonable charges for the transfer of credit risk." (Am. Countercl. ¶ 42.)

Contemporaneously with the issuance of the 2005 Variable Rate Bonds, the Authority entered into an interest rate swap agreement (the "Swap Agreement") with Piper Jaffray, in order to

hedge the Authority's risk as the issuer of the bonds.  The Swap
Agreement, which would remain in effect for the life of the 2005
Variable Rate Bonds, permitted either party to terminate it upon
the occurrence of certain events, such as a party's default or
bankruptcy.  In the event of an early termination, the Swap
Agreement provides for certain payments to compensate for the
termination. (See ISDA Master Agreement 8-11.)

On September 7, 2005, Ambac issued a surety bond for the
Swap Agreement (the "Surety Bond"). The Surety Bond provided
that if the Authority failed to make certain payments as
required in the Swap Agreement, including certain termination
payments, Ambac would make those payments.  Ambac is
specifically identified in the Swap Agreement as the issuer of
the Surety Bond and is given the title "Swap Insurer." The Swap
Agreement permitted Ambac to seek from the Authority the
reimbursement of any amounts paid under the Surety Bond, any
incurred fees, costs, or other expenses resulting from the
Authority's breach of the Swap Agreement. (See Schedule to the
ISDA Master Agreement 27.)

**C.    Conversion of the 2005 Bonds to Auction Rate Securities**

On December 9, 2007, with the consent of Ambac, the
Authority converted the 2005 Variable Rate Bonds into auction
rate bonds (the "2007 Auction Rate Bonds").  According to the
terms of the modified trust indenture, the interest rate of the

2007 Auction Rate Bonds would be determined by a competitive auction process in which buyers and sellers would bid for the sale and repurchase of the bonds.  Should the auction fail due to insufficient demand for the 2007 Auction Rate Bonds, however, the interest rate would revert to a default rate of 12%.

**D.    Ambac's Credit Rating Downgrade and the Authority's Default on the Swap Agreement**

The Authority alleges that, after the issuance of the 2005 Variable Rate Bonds but prior to the issuance of the 2007 Auction Rate Bonds, Ambac took a number of steps that caused it to deviate from its "historical underwriting standards." (Am. Countercl. ¶ 85.)  Specifically, Ambac became more reliant on revenue from guarantees of structured financial products, including mortgage-backed securities.  According to the Authority, Ambac was aware that the housing market was in a state of decline but failed to give the public or its guarantee clients notice that its underwriting standards were changing in an attempt to maintain short-term revenue growth goals. (See id. ¶¶ 84-98, 106-45.)  The Authority further alleges that Ambac made a number of statements falsely representing the quality of its structured product guarantees between late 2006 and January 2008. (See id. ¶¶ 99-104.)

Between January 18 and November 5, 2008, Fitch, S&P, and Moody's downgraded Ambac's credit ratings.  According to the

Authority, because the financial attractiveness of the 2007
Auction Rate Bonds was linked to the Bond Insurance Policies and
therefore Ambac's credit rating, the auctions that took place
subsequent to Ambac's downgrades resulted in steadily higher
interest rates for the 2007 Auction Rate Bonds.  Eventually, the
auctions began to fail and the Authority was forced to pay
$10,500,000 in additional interest costs, which the Authority
attributes to the ratings agencies' downgrades of Ambac.  The
Authority's additional costs were somewhat mitigated by the Swap
Agreement. (Am. Countercl. ¶ 157.)

      In addition to the need to pay far higher interest on the
2007 Auction Rate Securities, pursuant to the Swap Agreement,
the downgrade of Ambac's credit rating required the Authority
either to replace Ambac as the Swap Insurer or to obtain or
maintain an unenhanced rating on the Bonds at or above a certain
minimum within 30 days.  The Authority's failure to satisfy
either of those tasks within that time period would allow Piper
Jaffray to terminate the Swap Agreement.  Piper Jaffray did not
terminate the Swap Agreement in the aftermath of the initial
wave of downgrades, but on June 1, 2009, Piper Jaffray sent
notice to the Authority that it was exercising its right to
terminate the Swap Agreement and demanded a termination payment
of $4,524,000.

Due to further failed auctions, the Authority refunded the 2007 Auction Rate Securities and replaced them with fixed-rate securities.  The Authority alleges that the cost of issuance and increased interest costs for these fixed-rate bonds totaled $2,601,553.90. (Am. Countercl. ¶¶ 169-70.)

According to the Authority, changes in Ambac's underwriting standards greatly increased the possibility that it would face a credit downgrade.  The Authority alleges that Ambac was involved with the negotiation of the Swap Agreement and therefore Ambac "obviously knew that its credit downgrade below A3 by Moody's and A- by S&P . . . would not only result in increased interest costs to the Authority but could potentially, and likely, result in an unwinding of the Swap Agreement and the invocation of an obligation to pay a potentially significant Termination Fee." (Am. Countercl. ¶ 51.)

**E.   Procedural History**

The termination payment owed to Piper Jaffray by the Authority was made by Ambac pursuant to the terms of the Surety Bond.  Ambac then initiated the instant action to recover from the Authority, and later filed its Amended Complaint.  The Authority moved to dismiss the Amended Complaint on the grounds that this Court lacked subject matter jurisdiction and that venue in the Southern District of New York was improper.  On March 15, 2010, the Court denied the Authority's motion to

-7-

dismiss, and the Authority subsequently answered the First
Amended Complaint and brought counterclaims against Ambac.  The
Authority later filed its Amended Counterclaim, and Ambac moved
to dismiss the Amended Counterclaim for failure to state a claim
for which relief can be granted.

## II.  Discussion

In a diversity action, a district court decides matters of
substance according to applicable state law and matters of
procedure according to federal law. Gasperini v. Center for
Humanities, Inc., 518 U.S. 415, 427 (1996).  The parties agree
that, for purposes of deciding this motion to dismiss, the Court
should apply the substantive law of the State of California.

Procedural matters, such as whether particular facts are
sufficiently pleaded and the standard the Court must apply in
deciding a motion to dismiss, are governed by the Federal Rules
of Civil Procedure.  A pleading, such as a complaint or
counterclaim, states a claim for relief when it contains "a
short and plain statement of the grounds for the court's
jurisdiction," "a short and plain statement of the claim showing
that the pleader is entitled to relief," and "a demand for the
relief sought." Fed. R. Civ. P. 8(a)(1)-(3).  In determining
whether the factual allegations contained in a pleading
sufficiently support the legal allegations therein, the court
accepts all well-pleaded facts alleged in that pleading as true

and draws all inferences in favor of the party seeking relief.
In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 692
(2d Cir. 2009) (quotations omitted).

Heightened pleading requirements are imposed by the Federal
Rules of Civil Procedure when alleging fraud or mistake. Fed. R.
Civ. P. 9(b) ("In alleging fraud or mistake, a party must state
with particularity the circumstances constituting fraud or
mistake.  Malice, intent, knowledge, and other conditions of a
person's mind may be alleged generally.").  However, even when
no heightened or particularized pleading standards apply, a
court need not accept "[t]hreadbare recitals of the elements of
a cause of action, supported by mere conclusory statements."
Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Therefore,
"only a complaint that states a plausible claim for relief
survives a motion to dismiss." Id. at 1950.

## A.   Breach of Contract

The Authority claims that Ambac breached the contract
between the two parties by failing to inform the Authority of
Ambac's "true financial condition," specifically as required by
California Insurance Code § 332, and by its conduct that led to
the credit-rating downgrades. (See Am. Countercl. ¶¶ 175-177.)

The Authority contends that many documents, including the
Trust Indenture, the supplements to the Trust Indenture, the
Bond Insurance Policy, the Consent to Amend Indenture and

Convert the Bonds to Auction Rate, and others, constitute the contract into which both parties entered.  However, with regard to the Authority's claim that Ambac breached the contract by its conduct leading to the downgrades of its credit rating, it is irrelevant what documents are deemed to constitute the contract between the parties because none of these documents required Ambac to maintain a particular credit rating.  The contract requires that Ambac make payments to the holders of the 2005 Variable Rate Bonds (and later, the holders of the 2007 Auction Rate Bonds), as required in the Bond Insurance Policies, and to Piper Jaffray, as required by the Surety Bond.  It is undisputed that at all times Ambac complied with the express terms of the contract.

The Authority attempts to alter the clear meaning of the contract by asserting that the parties understood that Ambac's role as an insurer and guarantor would be economically meaningless unless it maintained a certain credit rating, and that "custom and practice of municipal bond insurance" requires an insurer to provide "credit enhancement," or the public perception of financial stability, rather than merely complying with the express terms of the policies or guarantees that the insurer issues.  California contract law requires that a court interpret a contract "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as

-10-

the same is ascertainable and lawful." Cal. Civ. Code § 1636 (West 2011).  In giving effect to the mutual intention of the parties, California law permits courts to look past the four corners of a contract, and to use extrinsic evidence of the parties' intention, but only to the extent necessary to clarify an ambiguity in the contract. Airborne Freight Corp. v. McPherson, 427 F.2d 1283, 1285 (9th Cir. 1970) ("Under California law . . . the determination of whether a contract is ambiguous presents a question of law.  In making this determination, the trial judge must receive extrinsic evidence concerning, primarily, the circumstances under which the agreement was made."); see also Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006) ("[E]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.") (quoting Morey v. Vannucci, 75 Cal. Rptr. 573, 578 (Cal. Ct. App. 1998)).

Here, the Authority argues that its contract with Ambac contained a latent ambiguity because the parties actually intended to enter into a "credit enhancement" agreement that required Ambac to maintain a certain credit rating if the entire arrangement was to have any economic value for the Authority.

-11-

There is no need to consider the Authority's allegations of external evidence defining the scope of the contract because even if the Court were to assume the truth of all the factual assertions underlying the Authority's claim of ambiguity, the language of the contract would still be unambiguous. See Airborne Freight Corp., 427 F.3d at 1286 ("If the court finds that the language of the instrument is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot then be received for the purpose of varying the terms of the contract.").  The Authority alleges that Ambac had an affirmative, contractual duty to use reasonable care to maintain its underwriting standards--and therefore its credit rating--because the Bond Insurance Policies constituted "credit support" or "enhancement." (Am. Countercl. ¶ 63.)  The Authority unsuccessfully attempts to construe an intended effect of Ambac's agreements to insure its bonds as a promise by Ambac that the Bond Insurance Policies would have such an effect. However, this construction of the contract between the Authority and Ambac conflicts with the express terms of the Bond Insurance Policies, the Trust Indenture, and the Surety Bond.  In none of these documents does Ambac assume a duty to maintain a particular credit rating, or represent that its insurance policy will have a particular effect for the life of the 2005 Variable Rate Bonds.  The Certificates of Bond Insurer for both the 2005

Series A Bonds and the 2005 Series B Bonds define the scope of
Ambac's obligation to include the payment of "interest and
principal on the Obligations in the event of a Nonpayment as
defined in the Insurance Policy," and the consideration paid by
the Authority represented "a reasonable charge for the transfer
of credit risk." (<u>See</u> Certificate of Bond Insurer concerning the
2005 Series A of the Taxable Variable Rate Refunding Revenue
Bonds.)  Even assuming that those in the municipal bond industry
understand the term "credit enhancement" to be defined as
alleged by the Authority, the Authority does not plausibly
allege that the admission of external evidence would support the
Authority's proposed interpretation of the contract. Rather,
interpreting the contract between the Authority and Ambac to
include a broad "credit enhancement" duty would impermissibly
"alter or vary the terms of the contract." <u>Midwest Television,
Inc. v. Scott, Lancaster, Mills & Atha, Inc.</u>, 252 Cal. Rptr.
573, 579 (Cal. Ct. App. 1988) (citations omitted).

The Authority alleges that Ambac breached the contract by
concealing information about its "true" financial condition from
the Authority and by failing to disclose information as required
by California Insurance Code § 322, which requires parties to
insurance contracts to "communicate to [each] other, in good
faith, all facts within [their] knowledge which are or which
[they] believe[ ] to be material to the contract and as to which

[they] make[ ] no warranty, and which the other has not the
means of ascertaining."  However, the duty under Section 322 of
the California Insurance Code attaches at the time of contract
formation, and is not a continuing duty to disclose any relevant
financial information after the parties have entered into the
contract.  See Mitchell v. United Nat'l Ins. Co., 25 Cal. Rptr.3d
627, 633 (2005).

    Assuming that this duty could be the basis for a breach of
contract claim against an insurer, the Authority nonetheless
fails to allege a viable claim for breach of contract because
this claim is based on the assertion that the conversion of the
2005 Variable Rate Bonds into the 2007 Auction Rate Bonds
constituted an amendment or novation of the Bond Insurance
Policies or the Surety Bond.  The Authority does not allege that
Ambac intentionally induced the Authority to convert its
variable rate debt into auction rate debt.  The Authority even
admits that it was required to request Ambac's consent before
substantially altering the nature of the securities which Ambac
was insuring and does not allege that Ambac was paid any
additional consideration in exchange for consenting to the
conversion.  This was not a modification or novation of the
original insurance policies.  Instead, as Ambac points out, the
Bond Insurance Policies specifically contemplated such a
conversion.  Therefore, the Authority's conversion of its 2005

Variable Rate Bonds did not constitute the formation of a
contract, and cannot serve as the basis for a claim under
California Insurance Code § 322.

Regardless of the Authority's subjective motivations for
purchasing the insurance policies offered by Ambac, Ambac never
assumed a contractual duty to maintain a certain credit rating
or to engage in any conduct other than to make the promised
payments pursuant to the Bond Insurance Policies and the Surety
Bond.  The Authority does not claim that the Authority failed to
make any such payments, or that Ambac promised it would continue
to maintain a particular credit rating.  Therefore, the
Authority's breach of contract claim cannot stand.

**B.    Fraud and Negligent Misrepresentation**

The Authority brings claims for fraud and for negligent
misrepresentation against Ambac, alleging that "Ambac deceived
the Authority by representing that it was continuing to adhere
to the strict underwriting standards and conservative business
strategies expected of a 'AAA' insurer, when in fact it was
engaging in extremely risky behavior which put such rating in
jeopardy," and that Ambac failed to disclose information
material to its financial condition. (Df.'s Mem. Opp. 26.)

Ambac challenges both the fraud and the negligent
misrepresentation claims based on allegations of affirmative
misrepresentation on the ground that the Authority fails to

plead reliance on any alleged misstatements.  Reliance is an
essential element of both fraud and negligent misrepresentation
claims under California law. Robinson Helicopter Co., Inc. v.
Dana Corp., 102 P.3d 268, 274 (Cal. 2004); Continental Airlines,
Inc. v. McDonnell Douglas Corp., 264 Cal. Rptr. 779, 784 (Cal.
Ct. App. 1989).  In its Amended Counterclaim, the Authority
alleges that Ambac falsely represented its financial stability
and its exposure to risk. (Am. Countercl. ¶¶ 64-66, 75, 82-94.)
However, the Authority does not allege that Ambac made untrue
statements to induce the Authority to enter into the Bond
Insurance Policies.  Instead, the Authority discusses
misrepresentations largely made after the formation of the Bond
Insurance Policies and changes in Ambac's underwriting standards
that began in June 2006 to support its claims of fraud and
negligent misrepresentation.

    With one exception addressed below, even where the
Authority does allege that Ambac made misstatements prior to the
formation of the Bond Insurance Policies, the Authority fails to
indicate whether any person affiliated with the Authority
actually viewed those statements prior to the formation of the
Bond Insurance Policies.  Misstatements made in public filings
are actionable only if they were actually considered in
connection with the transaction allegedly induced by the
misstatements.

-16-

The Authority does plausibly allege that it relied on one statement quoted in the Amended Counterclaim, which was originally made in Ambac Financial Group's Form 10-K for the fiscal year that ended on December 31, 2004. Specifically, Ambac's parent company represented that Ambac's practice was to guarantee "only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss." (Am. Countercl. ¶ 74.) The Form 10-K additionally stated that, "[i]n considering whether to guarantee [asset-backed securities], Ambac Assurance analyzes the quality of the underlying assets, the structure of the securitization, the experience and financial strength of the servicer of the underlying assets and the credit quality of the issuer." (Id.) The Authority claims that, subsequent to the formation of the Ambac Insurance Policy, Ambac changed the focus of its asset-backed security guarantee business.

There is no allegation that the statements in the 2004 Form 10-K were made with intent to deceive as required to sustain a claim for fraud, Robinson Helicopter Co., Inc., 102 P.2d at 274, or that the statements were untrue when made, as required to sustain a claim for negligent misrepresentation, Continental Airlines, Inc., 264 Cal. Rptr. at 784. Therefore, as presented in the Amended Counterclaim, the statements made in the 2004

Form 10-K cannot serve as the basis for a fraud or negligent misrepresentation claim.

The Authority contends that Ambac failed to disclose information regarding its exposure to the subprime market, its plan or intent to increase its exposure to the subprime market, risks of this subprime exposure, and its risk-assessment strategies.  Ambac argues that these claims based on allegedly material omissions fail because it had no duty to disclose this information.  First, to the extent that the Authority brings a claim for negligent misrepresentation based on alleged omissions, this claim fails because under California law, a negligent misrepresentation claim must be based on a "positive assertion," OCM Principal Opportunities Fund v. CIBC World Markets, 68 Cal. Rptr. 3d 828, 854 (Cal. Ct. App. 2007), and as discussed above, none of the assertions on which the Authority plausibly claims to have relied are alleged to have been false when made.

Second, to state a claim for fraud based on a material omission, a pleading must contain a plausible allegation that the claimant was owed a legal duty of disclosure.  Under California law, a duty of disclosure arises when one party owes fiduciary duties to the other, possesses exclusive knowledge of material facts not known to the other, actively conceals a material fact from the other, or makes materially misleading

-18-

partial representations to the other. Id. at 859.  Assuming
arguendo that Ambac had a duty to disclose all material
information at the time of the transaction, because it was in
possession of unique information about its finances, the
Authority's claim for fraud through omission still fails because
there is no allegation that Ambac failed to present relevant
information to the Authority at the time Ambac issued the Bond
Insurance Policies.  The duty to disclose, if there indeed was a
duty to disclose, attached at the time of the transaction that
was allegedly induced, yet all of the information allegedly
withheld by Ambac relates to post-transaction conduct of its
business and there was no continuing obligation to disclose such
information under the contract.

Finally, none of the Authority's fraud or negligent
misrepresentation claims based on its conversion of the 2005
Variable Rate Securities into auction rate securities in 2007
can stand because the Authority has not alleged that Ambac had
any intent to induce this conversion or made any affirmative
representation to the Authority with respect to its financial
condition in connection with the conversion.  Under California
law, intent is an essential element of a fraud claim, and an
affirmative misrepresentation is an essential element of a
negligent misrepresentation claim. Robinson Helicopter Co.,
Inc., 102 P.3d at 274; OCM Principal Opportunities Fund, 68 Cal.

Rptr. 3d at 854.  Ambac merely consented to the Authority's request for conversion, and the Authority has not alleged that Ambac profited from or was involved with the auction-rate conversion in a manner sufficient to support a valid claim for fraud or negligent misrepresentation.

## C.   Negligence

The Authority's negligence claim fails because it owed no duty of care independent from the contract between the two parties.  To survive a motion to dismiss, one bringing a cause of action for negligence under the law of California must show that the other owed the claimant a duty of care, breached that duty, and proximately caused the claimant's injuries. John B. v. Superior Court, 137 P.3d 153, 159 (Cal. 2006).  Whether a party had a duty to behave in a certain manner arising under tort law is a "question of law for the court." Id.  Accepting all of the Authority's well-pleaded allegations as true, it has failed adequately to plead a cause of action of negligence against Ambac.

Where parties have entered into a contract defining their respective obligations towards each other--as the parties have done in this case--a cause of action in tort cannot stand unless one party violated a duty arising from principles of tort law. Erlich v. Menezes, 981 P.2d 978, 983 (Cal. 1999).  Under California's economic loss doctrine, "economic loss alone,

-20-

without physical injury, does not amount to the type of damage that will cause a negligence or strict liability cause of action to accrue." <u>Cty. of Santa Clara v. Atl. Richfield Co.</u>, 40 Cal. Rptr. 3d 313, 335 (App. Div. 2006).  Therefore, the Authority has failed to identify any duty arising from principles of tort law that would permit it to bring an action for negligence against Ambac.  The Authority may not attempt to revive its deficient breach of contract, fraud, and negligent misrepresentation claims by bringing an action for negligence.

**D.   Breach of Implied Covenant of Good Faith and Fair Dealing**

Ambac seeks dismissal of the Authority's claim for breach of the implied covenant of good faith and fair dealing on the ground that this covenant cannot add substantive obligations under a contract, but only requires a contracting party to comply with the terms of a contract.  The Supreme Court of the State of California has described the principle "that neither party will do anything which injured the right of the other to receive the benefits of the agreement," as the "essence of the implied covenant of good faith in insurance policies." <u>Commercial Union Assurance Cos. v. Safeway Stores, Inc.</u>, 610 P.2d 1038, 1041 (Cal. 1980).  "The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." <u>Egan v. Mutual of Omaha Ins. Co.</u>, 620 P.2d 141, 145 (Cal. 1979).  In other words, this covenant exists

"merely to prevent one contracting party from unfairly frustrating the other party's right to receive the <u>benefits of the agreement actually made</u>." <u>Guz v. Bechtel Nat'l Inc.</u>, 8 P.3d 1089, 1110 (Cal. 2000) (emphasis in original).  Even if every inference is drawn in favor of the Authority, the contract between the Authority and Ambac cannot be construed as anything more than an agreement by Ambac to make certain payments so that the Authority would not be in default of its obligations to its bondholders or Piper Jaffray, its counterparty in the Swap Agreement.

The cases cited by the Authority suggesting that there is a special responsibility of good faith and fair dealing in the context of insurance contracts are inapposite.  California law imposes an obligation on insurers to settle claims in a reasonable and efficient manner, without undue delay.  <u>Crisci v. Security Ins. Co. of New Haven</u>, 426 P.2d 173, 176 (Cal. 1967) (recognizing as "common knowledge that one of the usual methods by which an insured receives protection under a liability insurance policy is by settlement of claims without litigation") (citation omitted).  As such, an insurer can be held liable for breach of an "implied covenant [of good faith and fair dealing] when the insurer unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement." <u>Id.</u> 176-77.  In this case, Ambac did

not unreasonably delay in the payment of any money owed to
bondholders or Piper Jaffray under the Bond Insurance Policies
or the Surety Bond.  Therefore, the special obligation of
insurers to settle claims without litigation cannot be a basis
for the Authority's claim of breach of the implied covenant of
good faith and fair dealing.

**E.   Unjust Enrichment or Restitution**

        In support of its motion to dismiss the Authority's claim
for unjust enrichment, Ambac argues that a claimant may not
recover for unjust enrichment when the parties' respective
rights and obligations have been determined by a contract.
Under California law, "unjust enrichment is an action in quasi-
contract, which does not lie when an enforceable, binding
agreement exists defining the rights of the parties." Paracor
Fin., Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1167
(9th Cir. 1996) (citations omitted); see also Durell v. Sharp
Healthcare, 108 Cal. Rptr. 3d 682, 699 (App. Div. 2010) ("As a
matter of law, unjust enrichment does not lie where the parties
have an enforceable express contract.").  In this case, the
insurance policies issued by Ambac set forth the obligations and
benefits arising from Ambac and the Authority's dealings with
each other.  Pursuant to these documents, Ambac was paid to
insure against certain clearly defined financial risks inherent
in the complex financial transaction into which the Authority

had entered with Piper Jaffray and the purchasers of the

Authority's securities.  The parties' mutual understanding of

the scope of the risk assumed by Ambac was set forth in a

contract, and the Authority has made no plausible allegation

that it would be unjust for Ambac to retain payments made to it

for the issuance of the policies. See Durell, 108 Cal. Reptr. 3d

at 699 ("The person receiving the benefit [at another's expense]

is required to make restitution only if the circumstances are

such that, as between two individuals, it is unjust for the

person to retain it." (emphasis in original) (quotation

omitted)).

The Authority contends that it should be permitted to bring

a claim of unjust enrichment against Ambac on three grounds.

First, the Authority argues that a plaintiff may bring a claim

for unjust enrichment against another party to a contract where

that contract is void.  The Court accepts this as a correct

statement of the law in California.  The appellate courts in

California have stated consistently that an "enforceable express

contract" is required to bar an action based on an implied-in-

fact or quasi-contract. See, e.g., Durell, 108 Cal. Rptr. 3d at

699.  However, this rule does not advance the Authority's case

because it has not plausibly pleaded any claim against Ambac

that would void the contract.  Second, the Authority argues that

the claim for unjust enrichment can stand, despite its contract

with Ambac, because the conduct giving rise to the unjust
enrichment claim "was not expressly covered by the Insurance
Contract." (Df.'s Mem. Opp. 33.)  This argument fails because
there is no dispute that Ambac was "enriched" only pursuant to
the terms of the Bond Insurance Policies.  Finally, the
Authority identifies "Ambac's misrepresentations and omissions
regarding its financial policies and health of [the] company" as
conduct out of the scope of the contract and therefore
supporting a claim of unjust enrichment.  This argument
similarly fails because the Authority has not adequately pleaded
a negligent misrepresentation or fraud claim.

     For the reasons stated above, the Authority's claim for
unjust enrichment cannot stand as pleaded in its Amended
Counterclaim.

**F.   Promissory Estoppel**

     The Authority alternatively seeks recovery for losses
resulting from the downgrade in Ambac's credit rating under a
theory of promissory estoppel.  Under California law, one
bringing a claim for promissory estoppel must establish that
another made "a promise clear and unambiguous in its terms,"
that the claimant reasonably and foreseeably relied on that
promise, and that the claimant was injured by such reliance.
Laks v. Coast Fed. Sav. & Loan Ass'n, 131 Cal. Rptr. 836, 839
(Cal. Ct. App. 1976).  The United States Court of Appeals for

the Ninth Circuit has indicated that a promise is sufficiently "clear and unambiguous" only where courts "can determine the scope of the duty" and the parties have defined "the scope of the duty and the limits of performance," providing a "rational basis for the assessment of damages." Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d 1000, 1017 (9th Cir. 2003).  In its Amended Counterclaim, the Authority alleges that Ambac "presented itself to the public and the Authority as [a] financially stable, risk-averse institution and marketed itself as a . . . AAA rated company that had a conservative investment and underwriting policy." (Am. Countercl. ¶ 191.)  The Authority claims that these representations were made "aggressively" and that Ambac encouraged the Authority's expectation of Ambac's financial stability "in order to induce the Authority to purchase" the Bond Insurance Policies. (Id. ¶¶ 192-93.)  None of these allegations constitute a "promise" that Ambac would provide "strong, consistent, and long-term credit support that would last for the entire life of the insured bond." (Id. ¶ 912.)  Indeed, in support of its claim for promissory estoppel, the Authority does not claim reliance on any "promise," but rather on certain "representations" allegedly made by Ambac. (See id. ¶ 194.)  The Authority's failure to identify any promise made by Ambac (other than its contractual obligations to make payments pursuant to the Bond Insurance

Policies and the Surety Bond) is fatal to its claim for
promissory estoppel.

### III.  Conclusion

For the reasons stated above, the Authority has failed
adequately to plead claims for breach of contract, fraud,
negligent misrepresentation, negligence, breach of the implied
duty of good faith and fair dealing, unjust enrichment, or
promissory estoppel.  The motion to dismiss is granted with
respect to all of the Authority's claims in the Amended
Counterclaim.

The parties are directed to appear for a conference on
December 2, 2011, at 11:00 a.m. in Courtroom 9-B of the Daniel
Patrick Moynihan United States Courthouse.


**SO ORDERED.**

Dated:     New York, New York
           November *14* , 2011

                                    John F. Keenan
                              United States District Judge


-27-