```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan. 11, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
AMBAC ASSURANCE CORPORATION,       :
                                   :
            Plaintiff,             :
                                   :     09 Civ. 5087 (JFK)
      -against-                    :
                                   :     **OPINION & ORDER**
ADELANTO PUBLIC UTILITY AUTHORITY, :
                                   :
            Defendant.             :
-----------------------------------X

APPEARANCES
    For Plaintiff Ambac Assurance Corporation:
        David W. Dykhouse
        Alexander Michaels
        Maren Messing
        Patterson Belknap Webb & Tyler LLP

    For Defendant Adelanto Public Utility Authority:
        Todd O. Litfin
        Rutan & Tucker, LLP

**JOHN F. KEENAN, United States District Judge:**

   Before the Court are cross motions for summary judgment in a diversity action brought by a surety, Ambac Assurance Corporation ("Ambac" or "Plaintiff") for reimbursement of a payment Ambac was required to make after the defendant, Adelanto Public Utility Authority (the "Authority" of "Defendant"), failed to make payment pursuant to a swap agreement. For the reasons stated below, Plaintiff's motion for summary judgment as to liability and damages on its first claim, and as to liability on its second and fourth claims, is granted. Defendant's motion for summary judgment is denied.

## I. Background

This action arises from the early termination of an interest rate swap agreement between Piper Jaffray & Company ("Piper Jaffray") and the Authority. Ambac, a surety to the agreement, brings claims against the Authority for reimbursement, breach of contract, and specific performance as a result of an early termination payment it made to Piper Jaffray that has not been reimbursed by the Authority.

Ambac, a Wisconsin corporation with its principal place of business in New York City, is in the business of surety and financial guaranty insurance. The Authority is a public utility authority existing under the laws of California, with its principal place of business in Adelanto, California.

In September 2005, the Authority issued $70,635,000 face amount of Variable Rate Revenue Bonds, 2005 Series A and B (Utility System Project) (the "Bonds"). The Bonds were underwritten by Piper Jaffray. Ambac issued a policy of bond insurance with respect to the Bonds, insuring payment of the principal and interest thereon. (Pl. 56.1 Statement ¶¶ 8-12.)

Contemporaneously with its issuance of the Bonds, the Authority entered into an interest rate swap agreement (the "Swap Agreement") with Piper Jaffray in order to hedge its risk as the issuer of the Bonds. The Swap Agreement stays in effect

for the life of the Bonds, but may be terminated upon the occurrence of certain events, such as a party's default. Piper Jaffray was also permitted to terminate the Swap Agreement if Ambac's credit rating was downgraded and the Authority did not take certain steps to shore up credit. In the event of an early termination, the Swap Agreement provides for certain payments to compensate for the termination. (Id. ¶¶ 19-21.)

On September 7, 2005, Ambac issued a surety bond for the Swap Agreement (the "Surety Bond"). The Surety Bond provides that if the Authority failed to make certain payments required by the Swap Agreement, including certain termination payments, Ambac would make those payments. (Id. ¶ 27.)

Ambac was not a party to the Swap Agreement, but it is specifically identified in it as the issuer of the Surety Bond as the "Swap Insurer." The Swap Agreement further provides that the Authority shall unconditionally reimburse Ambac, as the Swap Insurer, for any incurred fees, costs, or other expenses resulting from a breach of the Authority's obligations under the Swap Agreement. The Authority is also obligated under the Swap Agreement to reimburse Ambac for any amounts paid under the Surety Bond and any costs of collection and enforcement thereof, with interest at a specified rate. (Id. ¶¶ 30-32.)

3

On November 5, 2008, Moody's Investors Service downgraded Ambac's credit rating. (Def. 56.1 Statement ¶ 12.)  Under the terms of the Swap Agreement, the downgrade required the Authority either to replace Ambac as the Swap Insurer or to obtain or maintain an unenhanced rating on the Bonds at or above a certain minimum within thirty days.  The Authority's failure to satisfy either of those requirements within that time period would allow Piper Jaffray to terminate the Swap Agreement. Piper Jaffray chose not to terminate the Swap Agreement immediately after the Authority did not satisfy its obligations within the thirty-day period; instead, in a letter dated February 5, 2009, Piper Jaffray stated that it "would like to resolve this matter without terminating," but it would terminate if the Authority did not make "substantial and prompt progress" in resolving its financial difficulties. (Am. Compl. ¶ 16.)

Ultimately, the Authority failed to resolve its financial difficulties as specified in the Swap Agreement.  As a result, Piper Jaffray terminated the Swap Agreement and demanded a termination payment of $4,524,000 by notice dated June 1, 2009. The Authority's Executive Director, Dr. James Hart, testified at deposition that the Authority had the funds to make the termination payment at the time it was due, but on the errata

4

sheet issued in connection with his deposition transcript, Hart reversed this position. (Pl. 56.1 Statement ¶¶ 3, 4.)

Ultimately, Ambac made the $4,524,000 payment to Piper Jaffray on June 3, 2009, two days after the notice of termination because, according to Ambac, the Authority "failed to pay the termination payment in a timely manner," rendering Ambac liable for that amount pursuant to its obligations under the Surety Bond. (Am. Compl. ¶ 26.)

The Authority moved to dismiss the Amended Complaint on the grounds that this Court lacked subject matter jurisdiction and that venue in the Southern District of New York was improper. On March 15, 2010, the Court denied the Authority's motion to dismiss, Ambac Assurance Corp. v. Adelanto Pub. Util. Auth., 696 F. Supp. 2d 396, 398 (S.D.N.Y. 2010), and the Authority subsequently answered the Amended Complaint and brought counterclaims against Ambac.  The Authority later filed an Amended Counterclaim, which the Court dismissed on November 14, 2011. Ambac Assurance Corp. v. Adelanto Pub. Util. Auth., 09 Civ. 5087, 2011 WL 5553444 (S.D.N.Y. Nov. 14, 2011).

Ambac has moved for summary judgment as to liability and damages on its first claim (reimbursement), second claim (breach of contract), and fourth claim (reimbursement of expenses). According to Ambac, the Swap Agreement entitles Ambac to

5

interest along with the reimbursement of fees; if the Court finds liability as to the second or fourth claim Ambac would need to submit additional evidence of expenses. The Authority has cross-moved for summary judgment as to all claims.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is warranted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). Thus, when determining whether such factual issues exist, the Court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof. Celotex, 477 U.S. at 322-23. "The mere existence of a

scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003).

### B.   Choice of Law

The parties agree that the first cause of action, which arises under the Surety Bond, is governed by California law. The second, third, and fourth causes of action arise under the Swap Agreement, which includes a choice of law clause favoring New York.  The Court has previously analyzed these claims under New York law, Ambac, 696 F. Supp. 2d at 398.  In the instant motion, however, the Authority argues that because Ambac was not a party to the Swap Agreement, the choice of law clause is inapplicable.

Because Ambac is a third party beneficiary to the Swap Agreement, the forum selection clause is enforceable.  "It is well settled that an entity or individual that is a third-party beneficiary of the agreement may enforce a forum selection clause found within the agreement." See ComJet Aviation Mgmt., 758 N.Y.S. 2d 607, 608 (App. Div. 2003).  Therefore, consistent with prior opinions in this case, the Court will apply New York law to the second, third, and fourth causes of action.

### C. First Claim: Reimbursement

Ambac asserts that it is entitled to judgment on its first claim for relief (reimbursement), pursuant to California suretyship law. According to Ambac, when it made the termination payment to Piper, the Authority's duty of reimbursement under the Surety Bond was triggered. Therefore, Ambac argues, the Authority is liable to Ambac for the $4,524,000 termination payment.

In response, the Authority argues that (1) "reimbursement" is not a valid cause of action, but merely a remedy; (2) it is not liable to Ambac because Ambac has "unclean hands" in that it engaged in "risky investments and insurance schemes" that caused Ambac to lose its AAA rating; and (3) because Ambac's pristine credit rating was at the "core" of its franchise, it had a duty to ensure that it maintained that rating.

As an initial matter, Defendant's position that reimbursement is not a claim for relief is without merit, as California courts have routinely enforced such claims. See In re Kronemyer, 405 B.R. 915, 920 (9th Cir. 2009) ("Under Cal. Civ. Code § 2847, [defendant] has a direct claim against [plaintiff] for reimbursement of any amount ultimately paid on its bonds."). "The primary remedy that the surety can actually invoke against the principal is a suit based on the implied

8

obligation of reimbursement." Golden Eagle Ins. Co. v. First Nationwide Fin. Corp., 31 Cal. Rptr. 2d 815, 820 (Cal. 1994) (adding that reimbursement is a "cause of action [that arises] when the surety pays the creditor.").

Next, under California suretyship law, a surety is entitled to reimbursement from its principal for amounts paid to the obligee upon the principal's default. Cal. Civ. Code, § 2847 ("If a surety satisfies the principal obligation . . . the principal is bound to reimburse what he has disbursed, including necessary costs and expenses."); see also Cates Constr. Inc. v. Talbot Partners, 21 Cal. 4th 28, 48 (Cal. 1999).  Based upon admissions by both parties, a valid surety agreement existed between the Authority and Ambac, and Ambac made a payment to Piper Jaffray when the Authority defaulted.  See Def. Mot. at 10 ("Admittedly, Adelanto entered into the Swap Agreement, and, admittedly, Adelanto was unable to find a replacement swap insurer before the Swap Provider terminated the Agreement."). Indeed, the Authority has never disputed that it was required to make the Termination Payment. Pl. 56.1 ¶ 58.

In California, the "unclean hands doctrine" may bar subrogation claims, Wilson v. S.L. Rey, Inc., 21 Cal. Rptr. 2d 552, 557 (Cal. 1993), if the party can show "bad faith, or inequitable conduct by the plaintiff in connection with the

9

matter in controversy." <u>Mendoza v. Ruesga</u>, 86 Cal. Rptr. 3d 610 (Cal. 2008). <u>See also</u> <u>Bret Harte Inn, Inc., v. San Francisco</u>, 127 Cal. Rptr. 154 (Cal. 1976) ("For the unclean hands defense to apply, the plaintiff's inequitable conduct must be directly related to the events for which the plaintiff seeks.").

The Authority has not presented any evidence of "unconscionable, bad faith, or inequitable conduct" sufficient to avoid liability.  The Authority attempts to blame its default entirely on Ambac's credit downgrade.  This theory is belied by both the terms of the Swap Agreement and the undisputed facts. Upon Ambac's downgrade, the Swap Agreement provided that the Authority could take steps to find a new surety.  Indeed, Piper Jaffray gave the Authority more time than was contractually required in an effort to avoid terminating the Swap Agreement. The Authority did not satisfy the agreed-upon fallback parameters, however, triggering Piper Jaffray's termination of the Swap Agreement.  Therefore, the Authority's claim that Ambac "caused" the Authority's obligation to make the Termination Payment is inaccurate, as the Authority had control over whether Piper Jaffray could terminate the Swap Agreement.

Moreover, the Authority has presented no basis upon which a reasonable juror could conclude that Ambac acted in bad faith. The Authority has asserted that "Ambac was too heavily involved

10

in risky investments and insurance products," yet adduces no evidence that Ambac was making investment decisions in a nefarious attempt to thwart its AAA credit rating. The fact that Ambac expanded its portfolio to include more mortgage backed securities does not amount to misconduct, especially considering that the Authority has not proffered an explanation for why Ambac would actively seek a credit downgrade.

Nor can the Authority claim that Ambac's credit downgrade was unforeseeable. First, the Swap Agreement specifically provides for a potential Ambac downgrade, setting out steps the Authority would have needed to take to avoid Piper Jaffray's terminating the agreement. Second, Ambac issued a host of disclosures detailing its portfolio, warning that it could not guarantee that the ratings agencies would not downgrade its ratings in the future. (Pl. 56.1 Statement ¶¶ 13, 14, 18.) In light of the fact that the Authority was aware of the possibility of a downgrade, and had even included a provision addressing that possibility in the Swap Agreement, Ambac should not be barred from the reimbursement for which it contracted.

In sum, the downgrade of Ambac's credit rating does not absolve the Authority from its reimbursement obligations. Absent any evidence that Ambac's misconduct unduly exposed the

Authority to liability, California suretyship law imposes a clear obligation upon the Authority to reimburse Ambac.

### D. Second Claim: Breach of Contract

Ambac next claims that Adelanto is liable to Ambac under the terms of the Swap Agreement. The Swap Agreement provides: "The Government Entity [the Authority] hereby covenants and agrees that it shall reimburse Swap Insurer [Ambac] for any amounts paid by the Swap Insurer under the Swap Insurer policy." (Pl. 56.1 ¶ 29.) The Swap Agreement further provides that "to the extent of payments irrevocably made by Swap Insurer to the counterparty [Piper Jaffray] under the Swap Insurance Policy, Swap Insurer shall be fully subrogated to the rights of the Counterparty against Government Entity." Because Piper Jaffray properly terminated the Swap Agreement and because the Authority defaulted, forcing Ambac to pay Piper Jaffray, Ambac is entitled to reimbursement from the Authority.

The Authority responds that Ambac's breach of contract claim is barred by Ambac's "bad faith." Specifically, the Authority argues that Ambac "showed a conscious or knowing indifference to Adelanto's interest" in Ambac's maintaining high credit ratings. According to the Authority, while there is little precedent in New York to find bad faith absent fraud or collusion, "at least one federal court has noted" that there is

no "definitive definition of 'bad faith' in the surety-indemnification context" in New York.

Even if the Court accepted that bad faith without fraud or collusion could be a defense to breach of contract, there is simply no evidence of bad faith, as explained above.  Moreover, as the Court has previously found, "Ambac never assumed a contractual duty to maintain a certain credit rating." Ambac, 2011 WL 5553444 at *2.  The Authority is thus liable to Ambac under the Swap Agreement.

### E.  Third Claim:  Specific Performance

In its third claim for relief, Ambac requests the Court to use its equitable powers to order [the Authority] to "fix, prescribe, revise and collect rates, fees and charges" so that the Authority can reimburse Ambac.  Ambac proffers that this claim is not ripe for summary judgment.

Defendant moves for summary judgment on the third claim on the grounds that (1) specific performance is not a valid claim for relief, and (2) granting Plaintiff's claim would directly conflict with the California constitution, as Article XIIID of the California Constitution imposes certain notice and hearing requirements on the Authority before it can increase rates.

Specific performance is a valid claim in light of the Swap Agreement, which includes the covenant that the Authority would

"fix, prescribe, revise and collect rates, fees and charges . . . sufficient" to cover the Authority's liabilities. (Pl. 56.1 Statement ¶¶ 29, 63.)  Having found that the Authority has failed to comply with the Swap Agreement, the Court has the discretion to issue an order requiring the Authority to raise the funds necessary to comply with the Swap Agreement. See Da Silva v. Musso, 53 N.Y.2d 543 (1981) ("[T]he grant or denial of specific performance is a matter of sound judicial discretion.").

Next, the existence of constitutional prerequisites the Authority must satisfy before raising rates does not dictate that the Authority is entitled to summary judgment on this issue.  As an initial matter, there are issues of fact as to whether the Authority already has the funds it would need to reimburse Ambac.  If the Authority currently has the funds, then the California constitutional issue is moot.  If the Authority does not have the funds, the Court could issue an order granting specific performance under the Swap Agreement while still permitting compliance with the California constitution.  Such issues must be explored before determining whether specific performance is an appropriate remedy.

**F. Fourth Claim:   Reimbursement of Expenses**

Finally, Ambac argues that "the Swap Agreement unambiguously provides that the Authority must reimburse Ambac for all expenses incurred" during the enforcement of the Swap Agreement.  Ambac moves the Court for summary judgment as to liability on this issue.

The Authority has reiterated that "reimbursement" is not a cause of action, but a remedy.  As discussed above, reimbursement is a valid cause of action.  The Authority also repeats its argument that Ambac acted with "bad faith" and has "unclean hands," and therefore is not entitled to reimbursement.

Under the Swap Agreement, the Authority agreed:

> To reimburse [Ambac] immediately and unconditionally upon demand for all reasonable expenses incurred by [Ambac] in connection with the enforcement by [Ambac] of the [Authority's] obligations under this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by [Ambac] which are related to, or resulting from any breach by the [Authority] of its obligations hereunder.

(Pl. 56.1 Statement ¶ 32.)

The Authority does not present any evidence to call into question the enforceability of this provision.  Rather, the Authority relies on its argument that because Ambac allowed itself to receive a credit downgrade it does not deserve the protections of the contract.  The Court has rejected this theory and has determined that the terms of the Swap Agreement are

enforceable. Ambac is thus entitled to summary judgment as to liability, with the amount to be determined in later proceedings. See Rail Europe, Inc. v. Rail Pass Express, Inc., 09 Civ. 1506, 1996 WL 157503 at *5 (S.D.N.Y. Apr. 3, 1996); Newmark v. RKO Gen., Inc., 294 F. Supp. 358, 359 n.2 (S.D.N.Y. 1968), aff'd, 425 F.2d 348 (2d Cir.), cert. denied, 400 U.S. 854 (1970).

### III. Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is denied. The Court grants Plaintiff's motion for summary judgment as to liability and damages with respect to the first claim. Plaintiff's motion for partial summary judgment as to liability is granted with respect to claims two and four.

The parties are directed to appear at a conference on March 13, 2013 at 11:30 a.m. set a date for the trial — or other proceeding — to determine damages in this matter.

**SO ORDERED.**

Dated:   New York, New York
         January 11 , 2013

                                    John F. Keenan
                                    United States District Judge