USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug. 29, 2013

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------X
AMBAC ASSURANCE CORPORATION,          :
                                      :
                 Plaintiff,           :
                                      :          09 Civ. 5087 (JFK)
     -against-                        :
                                      :           **MEMORANDUM**
                                      :         **OPINION & ORDER**
ADELANTO PUBLIC UTILITY AUTHORITY,    :
                                      :
                 Defendant.           :
------------------------------------X

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Plaintiff Ambac Assurance Corporation's ("Ambac" or "Plaintiff") request for reimbursement of attorneys' fees and expenses. In an Opinion and Order dated January 11, 2013, the Court granted Plaintiff's motion for summary judgment as to liability and damages on its claim for reimbursement, and as to liability on its claims for specific performance and reimbursement of expenses. The Court further held that "Ambac is thus entitled to summary judgment as to liability, with the amount to be determined in later proceedings." Id. Unable to reach a resolution on damages, Defendant, Adelanto Public Utility Authority ("Defendant" or "Authority"), and Ambac briefed the issue of attorneys' fees and the Court held a hearing on August 23, 2013.

## I. Background

The Court presumes familiarity with the facts, as set forth in the summary judgment opinion. See Ambac Assurance Corp. v.

Adelanto Pub. Util. Auth., No. 09 Civ. 5087, 2013 WL 139557 (S.D.N.Y. Jan. 11, 2013).  In granting summary judgment for Ambac, the Court found the agreement at issue was enforceable, including the following obligation assumed by the Authority:

> To reimburse [Ambac] immediately and unconditionally upon demand for all reasonable expenses incurred by [Ambac] in connection with the enforcement by [Ambac] of the [Authority's] obligations under this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by [Ambac] which are related to, or resulting from any breach by the [Authority] of its obligations hereunder.

Id. at *7.

Ambac seeks an award of $1,693,815.19 for attorneys' fees and expenses it paid to Patterson Belknap Webb & Tyler ("Patterson Belknap") between February 27, 2009 and December 31, 2012.  This sum includes: (1) $1,500,628.80 in fees and expenses billed by Patterson Belknap, and (2) $193,186.39 in expenses billed by an outside vendor, Driven, which maintained an e-discovery database.

The Authority does not question the reasonableness of Patterson Belknap's hourly rates, but rather objects to the "generally excessive hours on matters throughout the case."  The Authority hired an expert on New York attorney's fees, Judith Bronsther ("Bronsther"), to evaluate Ambac's invoices.  In her declaration to the Court, Bronsther recommends "a reduction of at least $520,175 in legal fees and $26,705.44 in

disbursements." The Court will analyze each of Bronsther's objections that form the basis for her recommendation.

## II. Discussion

### A. Applicable Law

Because the Court has already determined that Ambac is due reimbursement and interest from the Authority, the only remaining inquiry is whether the requested fees are reasonable. The operative agreement is governed by New York law, so the Court will apply New York law to the reimbursement request.

In New York, it is well established that "any attorney . . . who applies for court-ordered compensation . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). The Court's task is to make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). The critical inquiry is "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992) (citation omitted), cert. denied, 506 U.S. 1053 (1993).

Additionally, if a court finds that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those hours from its calculation. Hensley v. Eckerhart, 461 U.S. at 434.  However, the Supreme Court noted in Hensley that "[t]here is no precise rule or formula for making these determinations." 461 U.S. at 436.  Finally, the party seeking fees bears the burden of establishing that the number of hours for which compensation is sought is reasonable. Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994).

### B. Analysis

Patterson Belknap has submitted a plethora of records detailing its work over this four-year litigation.  From its inception in 2009, the filings made by Patterson Belknap have included an answer to the amended complaint, two motions to dismiss, and cross motions for summary judgment.  In addition, discovery lasted for months and involved a series of motions for protective orders, which were also briefed.

#### i. "High Minimum Increments"

The Authority first objects to Patterson Belknap's bill on the grounds that some of the attorneys billed in increments of thirty minutes, rather than the generally accepted quarter-hour

4

increments.  For this, the Authority argues, the Court should cut the fee across the board by twenty percent.

This objection is without merit, as the Authority has misinterpreted the billing increments.  At some points in the invoices, a biller's time entry may be in a half-hour block, but at other times, it is in fifteen or twenty minute increments.  This supports the conclusion that the timekeeping was accurate, but that some billers happened to do work primarily or exclusively in thirty minute increments.

### ii. "Block Billing", Duplicative Work

The Authority next suggests that the time entries reflect "block billing," which "commingle activities and improperly group together several activities and improperly group together several activities."  The Authority says this practice impedes its ability to evaluate the fee request.

This Court has held that "itemization of billing entries is not required, so long as the different tasks which have been lumped together are compensable at the same rate." <u>Hutchinson v. McCabee</u>, 95 Civ. 5449, 2001 U.S. Dist. LEXIS 11927 (S.D.N.Y. Aug. 15, 2001) ("Although defendants are correct to some degree that block billing makes it more difficult for the Court to determine with precision exactly how much time was spent on each task, the practice of block billing is not prohibited in this

5

Circuit."). Since Defendants have not identified any so-called "lumped" entries in Plaintiff's application which impermissibly combine items requiring different rates of payment, the entries will not be reduced.

### iii. "Lack of Detail"

The Authority also objects to reimbursing plaintiff for certain hours billed by plaintiff's attorneys because the descriptions provided for the work performed are "vague." Bronsther states that the fee request "suffers from multiple instances of incomplete, vague, or inconsistent work descriptions that call into question the number of hours worked." For this deficiency, Bronsther suggests an across-the-board reduction of twenty percent. Next, she concludes that 3,179 hours billed by thirteen attorneys and various other "timekeepers" (such as paralegals and administrative assistants) is excessive. Finally, she asserts that the employees conducted duplicative work, which should be discounted.

A party seeking attorney's fees bears the burden of properly documenting the hours worked, and this obligation is not satisfied by a vague entry such as "conference with" or "call to" a particular person. New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). "[A]ny attorney . . . who applies for court-ordered

6

compensation in this Circuit . . . must document the application with contemporaneous time records.  These records should specify, for each attorney, the date, the hours expended, and the nature of the work done."  Where time records are submitted but the information provided is deficient, Courts have reduced the ultimate award by a percentage. See, e.g., United States Football League v. National Football League, 887 F.2d 408, 415 (2d Cir. 1989).

The Supreme Court has added that attorneys are "not required to record in detail how each minute of [their] time was expended[, but only to] identify the general subject matter of [their] time expenditures." Hensley v. Eckerhart, 461 U.S. at 437 n.12.  Moreover, "the specificity required for a particular entry is directly proportional to the amount of time billed in that entry." Pascutti v. N.Y. Yankees, 108 F. Supp. 2d 258, 270 (S.D.N.Y. 2000).

Plaintiff's counsel's application consists of an affirmation for attorneys' fees by David W. Dykhouse, Esq., including an itemized list of billable hours expended. The itemized list indicates, in three columns, the date of the billable activity, a brief description of the activity and the hours expended on that activity.

7

Almost all the entries "state the general subject matter" of the time spent, which satisfies the standard under Henley. Two individuals who apparently helped with discovery, however, have not entered sufficient detail to meet the standard. Entries by Jill-Ann Medlow and Juan Alvarez, listed on pages 27-28 of the Bronsther Declaration, include vague descriptions such as "prepare document collection for attorney review," and "continue review of documents for production." This statement does not convey any information about their work, much less describe the subject matter. Thus, the Court will reduce the fee attributed to the above statements by twenty percent.

Juan Alvarez's rate is $146 per hour, and the entries that are being reduced constitute 60.6 hours. Therefore, the initial bill of $8,847.60 is reduced by $1,769.52 to $7,078.08. Jill-Ann Medlow's rate is $228 per hour, and 43.6 of her hours are being reduced, bringing the initial fee of $9,940.80 down $1,988.16 to $7,952.64.

Similarly, entries by David Dykhouse labeled "misc email" do not convey the general subject matter of the work completed. The Court does not quarrel with Mr. Dykhouse's representation at oral argument that he conducted a great deal of correspondence over email and that including additional details would have been a "recordkeeping burden." However, to meet the standard in New

York for reimbursement, the entry must convey the subject matter, which "misc emails" does not.  Therefore, the Court will reduce this fee by twenty percent.  According to the Bronsther Declaration, Mr. Dykhouse billed $55,802.62 to "misc email."  A twenty percent discount reduces this figure by $11,160.52, to $44,642.10

The Court rejects the Authority's contention that the work is duplicative and excessive.  Although courts have reduced fees in circumstances "where the attorneys essentially duplicated each other's efforts," see Kapoor v. Rosenthal, 269 F. Supp. 2d 408, 414-15 (S.D.N.Y. 2003) (disallowing attorney's fees for work that was "duplicative and/or excessive"), most of the disputed work here does not appear to be duplicative or excessive.  In fact, it is commonplace for a junior lawyer to draft a document that is then reviewed and edited by a senior lawyer.  This practice is cost-efficient since it limits the amount of time expended by more senior attorneys with higher billing rates.  It is also customary for routine tasks to be completed by lower-level (and therefore cheaper) personnel.

### iv. "Inconsistent Internal Meetings"

Next, Defendant takes issue with the fact that, in some instances, one timekeeper reported an internal conference with another lawyer in the firm, yet the other lawyer does not have

an entry for the meeting.  Ambac proffers that this shows merely "superficial" differences in timekeeping practices.  Some lawyers and paralegals specifically describe a "meeting," while others choose to describe only the work done at that meeting.  This explanation is more than satisfactory, and the Court notes that if only one attendee of a meeting made a time entry for it, then Adelanto may actually have <u>saved</u> money.

### v. "Preemptive" Discovery Work

Defendant also takes issue with entries for discovery work that was billed prior to the Authority's serving of its first discovery request.  Ambac responds that since the Magistrate only permitted three months for discovery, Patterson Belknap immediately "set about identifying the Ambac custodians likely to have documents relating to the Authority's affirmative defenses and then collecting those documents.  When the Authority served its document requests, Ambac was able to promptly review the documents it had been collecting."  This is a cost-efficient practice and the Court sees no reason to discount the fee simply because Patterson Belknap did some anticipatory work.

### vi. Online Research

The Authority avers that it should not be forced to pay the $34,077.08 that was billed for computer research on Lexis and

Westlaw. According to Bronsther, "most law firms absorb such costs into their overhead and pay a flat rate for such services, but Ambac [has sought] recovery for an hourly retail rate." Patterson Belknap responds that the firm "does not profit from charges for Lexis and Westlaw" and the fees represent "an allocated pass-through of the charges Patterson Belknap" paid.

Consistent with authority in this Circuit, the Court finds that Ambac is entitled to reimbursement for the electronic legal research costs, since Patterson Belknap represented at oral argument that it regularly charges its clients for this cost. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 98 (2d Cir. 2004), superseded and amended on other grounds by 522 F.3d 182 (2d. Cir.2008)). ("We agree that the use of online research services likely reduces the number of hours required for an attorney's manual search, thereby lowering the lodestar, and that in the context of a fee-shifting provision, the charges for such online research may properly be included in a fee award. If [Defendant] normally bills its paying clients for the cost of online research services, that expense should be included in the fee award.")

### vii. Summer Associate's Work

The Authority contends that it is inappropriate to bill $5,346.25 ($228/hour for 23.50 hours, with some discounts) for

the work done by a summer associate. The Court finds that $228 per hour is far too high for a summer associate and will reduce it to $70 per hour. See Pannonia Farms, Inc. v. USA Cable, 2006 WL 2872566 at *2 (S.D.N.Y. Oct. 5, 2006), Weil v. Island Savings Bank, FSB, 188 F. Supp. 2d 265, 268-69 (E.D.N.Y. 2002); see also Larsen v. JBC Legal Group, P.C., 588 F. Supp. 2d 360 (E.D.N.Y. 2008). Donald Goodson's fee is reduced to $1,645.00, a discount of $3,701.25.

### viii. Depositions

The Authority requests a reduction for the 289 hours ($157,546.00) Patterson Belknap billed in defending two 30(b)(6) depositions and taking one 30(b)(6) deposition, which the Authority points out totals less than 13 hours of testimony. Patterson Belknap reminds the Court that the work billed in connection with the depositions also included Ambac's motion for a protective order, which required a significant amount of briefing. Patterson Belknap also notes that having more than one attorney present at depositions made them more efficient, because one attorney is able to find documents and exhibits while the other posits questions.

The Court does not quarrel with the fact that more than one attorney attended the depositions, but finds that billing 22 hours per hour of deposition testimony is exorbitant and should

be reduced.  The Court will reduce the deposition fee by twenty percent, or $31,509.20.  The total fee for deposition work is now $126,036.80.

### ix. Motion to Dismiss Counterclaims

The Authority also objects to Ambac's demand for fees incurred for opposing the Authority's counterclaim.  According to the Authority, "the premise of Adelanto's Counter Claim was that Adelanto should not be forced to pay for Ambac's alleged misconduct . . . . This is separate and apart from Ambac's request for attorney's fees based on its role as the surety."

Under New York law, "where a fee applicant recovers on a claim subject to a contractual attorney's fee provision and in the process litigates a counterclaim on which he must prevail in order to recover on his claim, then the fee applicant is entitled to his attorney's fees for both the claim and the counterclaim." Singer v. Shannon & Luchs Co., 670 F. Supp. 1024, 1028 (D. D.C. 1987); see also Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 525 (2d Cir. 1990) (affirming contractual award of attorney's fees to party "required to defend each action in order to establish its right to recover"); cf. Burger King, 710 F.2d at 1496-97 (affirming award of fees incurred developing overlapping issues relevant to both compensable and non-compensable matters).

In Diamond D Enterprises USA, Inc. v. Steinsvaag, 979 F.2d 14, 18 (2d Cir. 1992), the Second Circuit explained that "the nature-not the nomenclature-of a claim is controlling." Id.  The Diamond D court noted that the substance of the defendants' first four counterclaims "was also interposed as affirmative defenses," which indicated that the four affirmative defenses "arose out of the contract and threatened its effective enforcement." Id.  Where "the substance of [the counterclaims are] also interposed as affirmative defenses," that further indicates the relatedness of the claims and counterclaims. Id.

Such is the case here.  The Authority's counterclaim alleged breach of contract, breach of the covenant of good faith and fair dealing, fraud, unjust enrichment, promissory estoppel, negligence, and negligent misrepresentation, all premised on Ambac's alleged misconduct in losing its "AAA" credit rating. These counterclaims overlap with some of the thirty affirmative defenses that were interposed by the Authority (unclean hands, failure to mitigate, failure to act equitably, and breach of the covenant of good faith and fair dealing, e.g.).  Work done to defend against the counterclaim was the same work done to respond to the affirmative defenses.  Therefore, Ambac should be reimbursed for the attorney's fees incurred in defending against the Authority's counterclaim.

### x. Outside Vendor: Transperfect

Patterson Belknap billed $1,147.63 for "Transperfect Document Management" but provided no invoice for this service. Since Plaintiff has not provided an invoice for this service, it will not be reimbursed. See U.S. Football League, 887 F.2d at 415.  Therefore, the amount of reimbursement of expenses will be reduced by $1,147.63.

### xi. Interest

The parties do not contest that Ambac is entitled to interest on the Termination Payment as well as attorneys' fees and expenses.  The Swap Agreement set forth the following formula for calculating interest:

> For purposes of the foregoing, "Insurer Payment Rate" shall mean . . . the per annum rate of interest, publicly announced from time to time by JPMorgan Chase Bank, N.A. ("Chase") at its principal office in the City of New York, as its prime base lending rate ("Prime Rate") (any change in such Prime Rate to be effective on the date such change is announced by Chase) plus 3 percent . . . .  The Insurer Payment Rate hall be computed on the basis of the actual number of days elapsed over a year of 360 days.

Swap Agreement Schedule Part 5.

First, the Court will calculate the interest on the Termination Payment, which totals $4,524,000 and was paid by Ambac on June 3, 2009 (Zhang Decl. ¶ 2).  Chase's Prime Rate has been 3.25% from December 16, 2008 to present.  Therefore, the insurer payment rate, which is prime plus three percent, is

15

6.25%. Applying this rate to the Termination Payment beginning June 4, 2009 yields interest in the amount of $1,097,227.08 through March 31, 2013, plus $785.42 per day after March 31, 2013. This figure was submitted by Ambac, and the Authority has not objected to it.

Next, the Court will consider the interest due on fees and expenses, which is calculated using the same rate as above (6.25%). For the outside vendor, Driven, Ambac paid a total of $193,186.39. Ambac has calculated that the interest owed through March 31, 2013 is $8,237.61, plus $33.54 per day after March 31, 2013. The Authority does not object to this calculation and the Court agrees with it.

For the legal fees Ambac paid to Patterson Belknap, the Court has referred to Exhibit B of the Zhang Declaration. Since the various reductions the Court has detailed above require reducing individual invoices, this will yield reduced interest calculations for each of those invoices. The table below details the invoices affected by the Court's reductions, the amount of the reduction, and the new interest calculation:

| Invoice | Original Fee | Reduction | New Fee | Interest |
|---|---|---|---|---|
| 4/28/09 | $19,960.29 | $108.36 | $19,851.93 | $4,404.65 |
| 5/27/09 | $25,917.32 | $170.12 | $25,747.20 | $5,712.66 |
| 6/22/09 | $2,957.74 | $263.16 | $2,694.58 | $597.86 |
| 7/16/09 | $38,111.81 | $185.76 | $37,926.05 | $8,414.84 |
| 8/21/09 | $54,184.78 | $216.72 | $53,968.06 | $11,974.16 |
| 9/10/09 | $66,333.91 | $61.92 | $66,271.99 | $14,704.10 |
| 4/28/10 | $4,844.46 | $123.84 | $4,720.62 | $834.96 |

| | | | | |
|---|---|---|---|---|
| 5/19/10 | $13,902.56 | $77.40 | $13,825.16 | $2,445.33 |
| 6/25/10 | $71,230.88 | $139.32 | $71,091.56 | $11,196.92 |
| 8/25/10 | $43,987.77 | $46.44 | $43,941.33 | $6,838.37 |
| 9/22/10 | $51,341.88 | $15.48 | $51,326.40 | $7,987.61 |
| 7/15/11 | $1,424.37 | $108.36 | $1,316.01 | $133.25 |
| 12/8/11 | $13,189.77 | $15.48 | $13,174.29 | $1,070.41 |
| 1/4/12 | $47,536.14 | $133.16 | $47,402.98 | $3,021.94 |
| 2/21/12 | $75,602.19 | $877.84 | $74,724.35 | $4,763.67 |
| 3/9/12 | $171,702.27 | $2,464.16 | $169,238.11 | $10,788.93 |
| 4/11/12 | $127,517.56 | $804.96 | $126,712.60 | $6,018.85 |
| 5/8/12 | $81,658.59 | $44.68 | $81,613.91 | $3,876.66 |
| 6/7/12 | $97,460.39 | $395.12 | $97,065.27 | $4,610.60 |
| 7/16/12 | $87,362.95 | $755.16 | $86,607.79 | $3,734.96 |
| 8/7/12[1] | $129,534.11 | $31,787.84 | $97,746.27 | $1,832.74 |
| 9/12/12 | $76,983.48 | $271.60 | $76,711.88 | $1,438.35 |
| 10/5/12 | $84,886.60 | $139.32 | $84,747.28 | $1,589.01 |
| 11/13/12 | $68,632.86 | $30.96 | $68,601.90 | $1,114.78 |

Adjusted Total interest through 3/31/2013:    $119,105.67

From March 31, 2013, the daily interest rate for the adjusted total fee reimbursement of $1,449,352.52 is $251.62.

### III. Conclusion

For the reasons stated above, the requested reimbursement for attorneys' fees is reduced by $51,276.28. This means that the $1,500,628.80 in fees and expenses that were billed by Patterson Belknap is now $1,449,352.52. The Authority also owes $193,186.39 in expenses that were billed by the firm Driven.

The Authority owes interest on the Termination Payment in the amount of $1,097,227.08 plus $785.42 per day from March 31, 2013. The Authority also owes interest on the Driven expenses

---

[1] The Court deducted the deposition costs from the invoice dated 8/7/2012, which was issued immediately after the three depositions.

17

in the amount of $8,237.61 through March 31, 2013 and $33.54 per day thereafter. Finally, the Authority owes interest on the attorneys' fees in the amount of $119,105.67 through March 31, 2013 and at a rate of $251.62 each day after March 31, 2013.

The Clerk of Court is directed to close the case.

**SO ORDERED.**

Dated:   New York, New York
         August 29, 2013

*[signature]*
John F. Keenan
United States District Judge